377 P.2d 280]

[Crim. No. 7122.   In Bank.   Dec. 19, 1962.]

In re BETTY LOEB ALLEN on Habeas Corpus.

Burton Marks for Petitioner.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, William B. McKesson, District Attorney (Los Angeles), Harry Wood and Harry B. Sondheim, Deputy District Attorneys, for Respondent and Real Party in Interest.

GIBSON, C. J.—A petition for a writ of habeas corpus was filed in this court on behalf of Betty Loeb Allen, who was arrested and charged with a violation of section 22 of article 2 of Los Angeles County Gambling Ordinance No. 461. The section provides: "A person shall not knowingly permit any game prohibited by this ordinance to be played, conducted, or dealt, in any house or other premises, owned by, rented by, or in the lawful possession of such person." Section 21 of article 2 provides, in part: "A person shall not deal, play, carry on, open, cause to be opened, or conduct any game of chance played with cards, dice, or other device for money, checks, credits, or other thing of value."

The complaint in the criminal action alleged that defendant "did willfully and unlawfully and knowingly permit a game of chance, to wit: Bridge, played with cards, dice and other device, for money, checks, credits, and other things of value, to be played, . . ." There is no contention that bridge is played with dice or any device other than cards.

Defendant is entitled to be discharged if the allegations of the complaint affirmatively show that the conduct with which she is charged does not constitute a public offense (see *In re Jingles,* 27 Cal.2d 496, 499 [165 P.2d 12]; *In re Culver,* 187 Cal. 437, 439 [202 P. 661]; *Ex parte Greenall,* 153 Cal. 767, 770 [96 P. 804]; *Ex parte Williams,* 121 Cal. 328, 330 [53 P. 706]), and it is contended that bridge is a game of skill and not of chance and that therefore the complaint does not charge an offense.

The term "game of chance" has an accepted meaning established by numerous adjudications. Although different language is used in some of the cases in defining the term, the definitions are substantially the same. ▮ It is the character of the game rather than a particular player's skill or lack of it that determines whether the game is one of chance or skill. The test is not whether the game contains an element of chance or an element of skill but which of them is the dominating factor in determining the result of the game. *(People* v. *Settles,* 29 Cal.App.2d Supp. 781, 787 [78 P.2d 274]; *Boies* v. *Bartell,* 82 Ariz. 217 [310 P.2d 834, 837]; *State* v. *Hahn,* 105 Mont. 270 [72 P.2d 459, 461]; *Baedaro* v. *Caldwell,* 156 Neb. 489 [56 N.W.2d 706, 709]; *State* v. *Stroupe,* 238 N.C. 34 [76 S.E.2d 313, 316-317]; *D'Orio* v. *Startup Candy Co.,* 71 Utah 410 [266 P. 1037, 1038-1039, 60 A.L.R. 338]; see *Longstreth* v. *Cook,* 215 Ark. 72 [220

S.W.2d 433, 437]; *State* v. *Wiley*, 232 Iowa 443 [3 N.W.2d 620, 624]; *Adams* v. *Antonio* (Tex.Civ.App.) 88 S.W.2d 503, 505; cf. *Brown* v. *Board of Police Comrs.*, 58 Cal.App.2d 473, 479 [136 P.2d 617].)

The rules of the game of bridge, which have been established on an international basis, are set forth in encyclopedias and other texts, and we are satisfied from the rules and from the many publications on the subject that the game is predominantly one of skill. The details of the rules need not be repeated here; it is obvious that, although there is of course an element of chance resulting from the deal of the cards, there is a continually recurring necessity in the bidding and play of the hand to make decisions which, considered together, will ordinarily be determinative of the outcome of the game. It is pointed out in 6 Encylopaedia Britannica (1962) p. 349, that bridge "embraces a technique which in complexity approaches that of chess; and, in addition, a scope for deductive analysis, psychology, alertness and mental ascendancy over one's opponents. Thus it is an art, which can hardly be taught or even described."

Other texts discussing bridge are in accord with the view that it is predominantly a game of skill. (See, e.g., Culbertson, Contract Bridge Complete (1954) p. 28; Goren, The Elements of Bridge (1960) foreword; Karpin, Psychological Strategy in Contract Bridge (1960) p. vii.) At least one case has so held. *(Stubbs* v. *Dick* (Ohio Com. Pleas) 89 N.E.2d 480, 482 et seq.) It has been said that the literature on bridge is unapproached in quantity by that on any other game and that more than 5,000 volumes were written on the subject between 1927 and midcentury. (See 6 Encyclopaedia Britannica (1962) p. 349; Goren's Hoyle, Encyclopedia of Games (1961) p. 115.) There are periodicals dealing with the game (see, e.g., Bridge World; Bridge Magazine) and daily newspaper columns discussing the best methods of bidding and playing particular hands. The existence of such a large amount of literature designed to increase the player's skill is a persuasive indication that bridge is not predominantly a game of chance.

The complaint shows on its face that an offense is not charged, and therefore we do not reach the further contention made by defendant that the state has occupied the field of the criminal aspects of gambling to the exclusion of local regulation.

The writ is granted, and defendant is discharged from custody.

Traynor, J., Peters, J., Tobriner, J., and White, J.,* concurred.

McCOMB, J., Dissenting.—I dissent.: .It is my view that bridge is a "game of chance."

Defendant contends that the phrase "game of chance" in Ordinance 461 is vague, indefinite and uncertain in meaning and denies her due process of law and equal protection under Amendments V and XIV of the United States Constitution and sections 13 and 19, article I, of the California Constitution. The phrase "game of chance," however, has an accepted legal meaning. It appears throughout the English language as a means of expressing a concept used by legislatures of various jurisdictions in statutes, by courts of various jurisdictions as an analytical tool in ascertaining what is and what is not a "lottery," or "gambling or gaming device'' (cf. *Commonwealth* v. *Lake*, 317 Mass. 264 [57 N.E.2d 923]; *Boies* v. *Bartell*, 82 Ariz. 217 [310 P.2d ,834]), and by the people of various jurisdictions in their constitutions (cf. Neb. Const., art. III, § 24; Utah Const., art. VI, § 28).

The character of the game, and not the skill or want of skill of the player, is what determines whether a game is a "game of chance" or a "game of skill." The test is not whether the game contains an element of chance or an element of skill but what is the dominating element that determines the result of the game; and a game does not cease to be a game of chance because it calls for the exercise of skill. *(People* v. *Welti,* 179 Misc. 76 [37 N.Y.S.2d 552, 555]; *State* v. *Stroupe,* 238 N.C. 34 [76 S.E.2d 313; 316-317]; *People* v. *Lavin,* 179 N.Y. 164 [71 N.E. 753, 755]; *State* v. *Gupton,* 30 N.C. (8 Ired. L.) 271, 273-274; cf. *Brown* v. *Board of Police Comrs.,* 58 Cal.App.2d 473, 479 [136 P.2d 617]; *People* v. *Settles,* 29 Cal.App.2d Supp. 781,.878 [6] [78 P.2d 274]; see also. definition of "game of chance." in Webster's New Internat. Dict. (3d ed. 1961), p. 933.)

In Encyclopedia Americana (1957) at .page 529, it is stated: "Duplicate Bridge.—This is the form of bridge, either auction or contract, in which the same hand is played more than once. It is the form played in tournaments, *since*

---

*Retired Justice of the Supreme Court sitting pro tempore under assignment by the Chairman of the Judicial Council.

*it reduces to a minimum the element of luck,* scores being based on a comparison of the results achieved with the same cards. ELY CULBERTSON, Bridge Authority and Author.'' (Italics added.)

It is evident that if the element of luck is reduced in duplicate bridge, it is much higher in the type of bridge that is the subject of the present case.

Certainly in duplicate bridge it may be expected that in a series of games the more skillful players should ordinarily end with higher scores than the less skillful. Even this result, however, is by no means certain, and in other than duplicate bridge the element of chance may well be predominant in many a match, particularly when the opposing players are of somewhat equivalent skills.

A criminal statute must be definite enough to provide a standard of conduct for those whose activities are proscribed, but reasonable certainty in view of the conditions is all that is required. *(People* v. *McCaughan,* 49 Cal.2d 409, 414 [317 P.2d 974] ; .*People* v. *Hallner,* 43 Cal.2d 715, 720 [6] [277 P.2d 393] ; *In re Clarke,* 149 Cal.App.2d 802, 806 [8] [309 P.2d 142].)

As stated in *Kelly* v. *Mahoney,* 185 Cal.App.2d 799, 804 [11] [8 Cal.Rptr. 521] : ''The requirement of reasonable certainty does not preclude the use of ordinary terms to express ideas which find adequate interpretation in common usage and understanding.''

The fact that there may be marginal cases in which it is difficult to determine the side of the line on which a particular fact situation falls is not sufficient reason to hold the language too ambiguous to define a criminal offense. *(Roth* v. *United States,* 354 U.S. 476, 491 et seq. [77 S.Ct. 1304, 1 L. Ed.2d 1498] ; *United States* v. *Harriss,* 347 U.S. 612, 618 [74 S.Ct. 808, 98 L. Ed. 989] ; *Jordan* v. *DeGeorge,* 341 U.S. 223, 231 et seq. [71 S.Ct. 703, 95 L Ed. 886] ; *United States* v. *Petrillo,* 332 U.S. 1, 7 [67 S.Ct. 1538, 91 L. Ed. 1877].)

Under these rules, the language of the ordinance is sufficiently definite to give adequate warning as to the proscribed conduct.

Defendant also contends that the state has occupied the field with respect to gambling and that the ordinance is invalid on this ground.

Gambling is not a matter which comes within those municipal affairs as to which local regulations are superior to state statutes. *(In re Portnoy,* 21 Cal.2d 237, 239 [1] [131 P.2d

1].) Local regulations pertaining to gambling are therefore invalid if they are in conflict with state legislation on the subject. (Cal. Const., art. XI, § 11.)

It is now settled that if the state has occupied a particular field, any local regulation therein is in conflict and hence invalid. *(Abbott* v. *City of Los Angeles,* 53 Cal.2d 674, 682 [9] et seq. [3 Cal.Rptr. 158, 349 P.2d 974]; cf. *In re Lane,* 58 Cal.2d 99, 102 [2] [22 Cal.Rptr. 857, 372 P.2d 897].) Accordingly, if the field of gambling has been preempted by the general law, a local municipal ordinance with respect thereto is invalid.

The Legislature has not by express language indicated whether or not it has intended to preempt the field of gambling. In determining the legislative intention in this respect, however, we must give due regard to the fact that this court, as long ago as 1900, held in *In re Murphy,* 128 Cal. 29 [60 P. 465], that a municipality could by local ordinance prohibit all games of chance played for money other than those covered by section 330 of the Penal Code, and no action has been taken by the Legislature to increase the scope of that section or to evidence in any way an intent to exclude local regulation in this field.

The failure of the Legislature to so act during a period of over 60 years in the face of such a ruling, which has been consistently followed in other gambling cases *(In re Portnoy, supra,* 21 Cal.2d 237, 239 [1] [131 P.2d 1]; *In re Farrant,* 181 Cal.App.2d 231, 232 [1a] [5 Cal.Rptr. 171]; *Remmer* v. *Municipal Court,* 90 Cal.App.2d 854, 856 [2] [204 P.2d 92] [hearing denied by the Supreme Court]; see also *Ex parte McClain,* 134 Cal. 110, 111 [66 P. 69, 86 Am.St.Rep. 243, 54 L.R.A. 779]; *Sternall* v. *Strand,* 76 Cal.App.2d 432, 434 [1a] et seq. [172 P.2d 921] [hearing denied by the Supreme Court]; *In re Lawrence,* 55 Cal.App.2d 491, 498 [7] et seq. [131 P.2d 27]), constitutes in itself confirmation of an intention not to preempt the field. *(In re Farrant, supra,* at page 238 [6].)

Furthermore, when the 1962 Legislature added section 337s to the Penal Code* prohibiting draw poker, it made the prohibition operative only in those counties where the electorate should so determine, expressly confirming the right of any other county, and the cities therein, to enact ordinances prohibiting, restricting, or regulating the playing of draw

---

*By Assembly Bill No. 9.

poker. This is additional evidence that the Legislature has not intended to preempt the field of gambling.

Accordingly, we should hold that in the field of gambling there is room for local regulation in the form of additional reasonable requirements not in conflict with provisions of the general law. (Cf. *Pipoly* v. *Benson,* 20 Cal.2d 366, 370 [4] et seq. [125 P.2d 482, 147 A.L.R. 515].)

In *In re Lane, supra,* 58 Cal.2d 99, 103 [5], and the cases there relied on, we found, on the basis of the extensive coverage of the subject matter under consideration, that the Legislature had intended to occupy the particular field. In those cases, however, there were no additional guides to determine what the Legislature intended, as there are in the present case and as existed in prior cases such as *Natural Milk etc. Assn.* v. *City & County of San Francisco,* 20 Cal.2d 101, 110 [2c] et seq. [124 P.2d 25], where although the state legislation was comprehensive, the statute expressly authorized local regulation.

To the extent that a local ordinance covers gambling activities condemned by the Penal Code, it is in conflict with the general law and hence invalid; but if invalid portions are separable from portions which are valid, the latter will be upheld. *(In re Murphy, supra,* 128 Cal. 29, 31; *In re Farrant, supra,* 181 Cal.App.2d 231, 236 et seq.; *Remmer* v. *Municipal Court, supra,* 90 Cal.App.2d 854, 856 [2] et seq.; cf. *In re Portnoy, supra,* 21 Cal.2d 237, 240 [2] et seq.)

Since the game of bridge is not condemned by the Penal Code, the ordinance in question, to the extent it may prohibit such game, does not conflict with provisions of the general law and is therefore a valid enactment.

I would deny the writ of habeas corpus.

Schauer, J., concurred.